Good morning. May it please the Court, Lisa Kolbialka on behalf of the Freecycle Network Incorporated, the appellant in this particular matter. I'd like to reserve two minutes for rebuttal time if it's necessary. We're here today to address a very fact-intensive inquiry that surrounds an allegation of naked licensing. And there are very important principles of trademark law as well as evidentiary standards that are at issue here as a result of the There are a number of different pieces of evidence that are material issues of fact that would preclude a finding of naked licensing that were not viewed in the light most favorable to the non-movement in this case, which was the Freecycle Network. And in doing so, these material issues of fact directly relate to the ultimate issue here, which deals with whether or not there was naked licensing and ultimately deception to the public. Counsel, you're so much more familiar with these terms than we are. Why don't you tell us what naked licensing is? Certainly. So naked licensing is a trademark principle whereby you have uncontrolled licensing of a mark such that it causes deception or loss of significance of the mark. As you know, the Lanham Act and trademark laws are intended to protect consumers and to ensure that consumers are not going to be deceived about the particular source of a particular good or service necessarily. So there is this principle known as naked licensing that's intended to ensure that there isn't some form of licensing of a mark such that anyone could use it, such that consumers would come across it and somehow be confused as to who the source is. And that goes to the heart of one of the issues here before the Court, which is deception. Well, what is your — what is TFN's strongest argument that there was adequate quality controls in place in October of 2003 when FS was granted use of the trademarks? The strongest evidence of the quality controls include the free, legal, and appropriate for all ages, which existed actually before that time. The undisputed evidence in the record was that there was actually, as of September 2003 — But that's just a slogan. What adequate quality controls were in place? That is specifically, actually, a distinction and goes to what distinguishes the Free Cycle Network from other Internet websites. If you turn back to — It sort of seems like you're relying on it's almost, what is it, like pornography? I know what when I see it, that we're supposed to know what all of that means and that you don't have to do anything else. No, it isn't. It actually goes beyond that because the fundamental principle of the Free Cycle Network is that it is free and it is not used as a result of gifting. So a key component to the Free Cycle Network and what is a hallmark of that particular entity versus other Internet entities goes to this concept of, A, it being free, that there's no non-commercial uses of this particular network. You don't have advertisements, for example. You don't have links to commercial sites or services, those type of things. Additional, being appropriate for all ages, this also distinguished it because it made sure that there was no, for example, adult offerings, adult-only type offerings, that once again, this was another distinguishing factor of the Free Cycle Network. So all of that ties together. In addition to that, there was the etiquette, which had a consistency in terms of the overall consumer experience with which how postings were to be provided. So there was posting procedures that people were required to follow. There was no spam or politics, which is another distinguishing factor to the Free Cycle Network. And in addition to that, there was the two strikes and you're out rule. Which of these rules, slogans or standards was subject to local variation? These rules were not subject to local variation. The local variation relates to the individual community. So for example, what may be legal for somebody in San Francisco may not be legal for someone in Sweden or Qatar or China. The Free Cycle Network had amazing foresight to recognize that the local community needs needed to be addressed. And as a result of that, today it's 7.5 million strong, 4,800 groups in over 120 countries. It has definitely been able to distinguish itself and set itself apart by virtue of its membership. How is requiring people to follow the law unique enough to grant anything? I mean, isn't that kind of an assumption that's built into all business models? Not necessarily. There are — there's a variation in law. We had cited as an example in our brief the Tiffany v. eBay case where there are certain representations made about the quality of products being sold on eBay, whether or not it's genuine or on eBay. For the Free Cycle Network, because of its grassroots movement and the nature of the particular service and what they were attempting to achieve, it was important that they were really looking to something being legal, and that may be very specific to that specific community at that time. So in addition to those type of quality controls, there was also the ethos that was the core set of principles that existed, the core set of values, which went to the democratic nature of the communities themselves and looking for each of the local communities to ensure that they can utilize the Free Cycle Network within its core set of principles, but address the needs of their specific community. Additional quality controls include the fact that Mr. Beale, the founder of the Free Cycle Network, personally monitored, and he was the one that would look at particular member groups who requested to become a member of the Free Cycle Network. He would determine whether or not they were fitting within what the Free Cycle Network was about, what distinguished it from everybody else, and then he would go ahead and list them onto the central listing agency, so they could become part of the overall Free Cycle Network. Now, but the district court, I know that you, this free, legal, and appropriate for all ages, you rely on that, but the district court found that the 2004 adoption of that was not a quality control measure, since TFN allowed FS to use the trademarks for months before its adoption, and even after its adoption, the rule wasn't enforced. Right, and this is one of the errors the district court made, which is it did not look at the undisputed evidence, which was, in fact, that it was September 2003, which was before Free Cycle Sunnyvale even wanted to become a member and tried to join the Free Cycle Network, that there was this free, legal, and appropriate for all ages. That specific email was, it's on ER 277 in the record, the excerpt of record there, and so the district court actually didn't view the evidence in the light most favorable to the Free Cycle Network. What evidence for it? You talked about the adequate rules, and the district court found that there was no evidence that the adequate rules had to even be adopted, so if that's not even a requirement, how can that be part of your quality control? This is another hotly contested disputed issue of material facts. Well, she's pointing to evidence that said they had to adopt it in the record. So in the excerpts of record, pages 274 through 281 and 79 through 80, there was declarations that said the adequate had to be part of what you were going to do when you came into the Free Cycle Network. This was all part of what Mr. Beal was doing when he was personally monitoring, making sure that everyone was complying overall with the goals and the common interests of all of the member groups. Keep in mind, they all had the same interest at heart, and this was a non-profit organization with no money that was just getting started off the ground in early 2003, I believe it was March, when Free Cycle Sunnyvale came into the... Can you, though, it seems to be some things came after Free Cycle came in. How can you relate that back? I'm starting to run out of time, but the issues of the other quality controls that had come into place or the strengthening of them was as the actual organization grew. Common sense and reality dictates that when they first got started, they may not have realized how big it was going to be, how quickly it was going to grow, and so they had their initial set of quality controls in place, and those progressively got stronger, better, and fit the overall needs as the Free Cycle network itself got larger. So the timing of all of this, how long the alleged licensing conduct supposedly took place is very, very short, and that once again ties directly into the fact there is no evidence whatsoever that there was any loss of significance of any of these three individual marks, and we have to keep in mind, you can't just lump three trademarks and say, we're going to strip a There was just one single email out there that constituted naked licensing, and it's undisputed in the record that shortly thereafter, within days of the Free Cycle Sunnyvale coming into the Free Cycle network, there was the moderator squad or the mod squad that came into place, there was the penguin patrol, so there was all these different volunteer groups who were ensuring that everyone was getting a consistent experience and that these quality controls were being enforced and in place. I think I have to sum up. Thank you, counsel. We'll hear from Mr. Evans. May it please the Court. Eric Evans for Apelli Free Cycle Sunnyvale. I think it's worth quoting at length the license that the Free Cycle network granted to Free Cycle Sunnyvale. You can get your own neutral logo from www.freecycle.org, just don't use it for commercial purposes, or you, maybe Mark or Albert can help you do up your own fancy schmancy logo. That's the entire explicit license from the Free Cycle network to Free Cycle Sunnyvale, and as you'll note, it includes the one limitation, just don't use it for the scope of the license. It includes no quality control term, and it includes clear authorization to create a composite mark. Counsel, if that email were combined with extensive actual supervision and control, would those have to be considered together, or would this email control over everything else? The email contains the terms of the explicit license. Under some circumstances where there is a close relationship between the licensor and the licensee, extra-contractual monitoring may avoid naked licensing, but as the court has noted, what TFN, the Free Cycle network, portrays as quality control is really slogans and ethos. Well, yeah, I guess I wanted to deal with the sort of theoretical construct first, and whether your argument is once we know there's an email that contains one limitation only, we close our eyes to everything else, or whether we then go on to also analyze whether there were quality controls viewing the evidence in their favor or not. In other words, I know these aren't your facts, but if the next day there was a phone call saying, well, now that we're in this together, now that you're going to have our mark, here are the things you're going to have to do, and they send down ten people and et cetera, et cetera, and have actual supervision, is that relevant? In the scenario that the court is describing, the licensor would have a substantially stronger argument against naked licensing. Well, it would be a triable issue, wouldn't it, if it had those facts? If there were actual centralized control. Okay. So I guess that's the only thing I'm looking for, is that the fact of the email by itself doesn't mean that we don't go on to think about the next step, which is, was there something additional here? Yes, that is correct. Okay. And you just are arguing, no, there's nothing additional here. We are arguing that TFN, as you just saw, admits that it delegates decisions about the content of the rules it describes as quality control to its individual licensees, that it delegates enforcement of those rules defined by the licensees to the licensees themselves, and that, as you noted, the one piece of what they would call quality control they can point to at the time that FreeCycle Sunnyvale received its license is the slogan, free, legal, and simply restates the scope of the license to FreeCycle Sunnyvale, just don't use it for commercial purposes. In the second case, as legal, simply states a preexisting duty. All of us, wherever we are, are already obligated to obey the law. So a set of sort of volunteer people who send e-mail messages telling me that I should obey the law doesn't change my preexisting duty. Well, let's just assume that TFN had the quality controls of the noncommercial service requirement, a guideline for proper etiquette, and a FreeCycle ethos in place in October 2003, when FS was authorized to use the trademarks. Why does the existence of some alleged quality controls not raise a genuine issue of material fact and therefore make summary judgment inappropriate? Because the facts to which the FreeCycle network is pointing are, show sort of a slogan, a set of ideas, a general sort of guidance about how to behave. They are not the hard and fast rules that ensure consistency that are required to avoid naked licensing under these circumstances. So there's no dispute between the parties about the facts. Yes, at a later date, the FreeCycle network began to promulgate this ethos and the etiquette, but those are not indications of quality control. They are indications that within the FreeCycling movement, there were a set of general ideas about how people might behave. And that is different. Can they benefit by, can they create a triable issue for things that happen after they initially have contact with FreeCycle, when they initially authorize the use? Under the undisputed facts in this case, no. Because the facts to which they point that arise after the grant of the explicit license are not facts that show quality control. They show a discussion among people within the FreeCycling movement about how the movement might develop. But that's very different from the centralized control that ensures consistent quality. So are you saying we don't have to decide whether to adopt the Fifth Circuit's apparent rule that afterward supervision, if it's very close in time, can still demonstrate something other than a naked license? Because, again, you're saying there isn't any actual control and supervision. So in your scenario, we don't have to decide that issue. Yes, that is correct. That issue is not something the Court needs to decide. In an environment where, you know, there had been sort of non-delegated, centralized, and consistent quality control, that issue might arise. But as FreeCycle, as the FreeCycle network has admitted here, that did not occur. And the only thing they can point to, as far as what they would describe as quality control, as of the time of the license, is the free, legal, and appropriate for all ages slogan, which does no work and is left to Well, appropriate for all ages was not mentioned in the email, right? I believe that it was not, no. So that's an additional condition that's imposed by the use of the slogan. Isn't that some evidence of quality control? But appropriate for all ages is defined according to the decision... Except I like it. And Your Honor has perfectly captured the difficulty with presenting appropriate for all ages as a measure of quality control. In an environment where each local licensee is left to determine what is appropriate for all ages, that will mean something very different for every licensee. And where a term means something different for every licensee, there is no consistency. And while the FreeCycle network has stated that, you know, the mere lack of consistency will not cause naked licensing, this Court has meaningful in holding the email mailing list to a standard of quality, good, bad, or otherwise. And that lack of retained and enforced quality control was sufficient for naked licensing in BARC America and is sufficient here. Finally, one last point, which is that Ms. Kobialka mentioned Mr. Beale's purported, you know, quality control efforts on his own. We understand that that issue was not raised in the FreeCycle network's briefs below. And we believe that it is therefore waived on appeal as established in Harkins. I have a question about what you just said. Is that information in the record? Was it in the record before the district court? I believe it was in the record. It is in the record site. So we have de novo review in determining whether there is a material issue fact, correct? Yes. So why should we not consider those facts if they are facts in the record? Because the Ninth Circuit held in Harkins that facts that are not presented to the district court in a memorandum are not available for review on appeal. I think that may be stating it too strongly. The Carmen case said something similar. But it was a matter of judicial efficiency that we would not be forced to comb the record where nobody had explained anything. But I don't think it's really a matter of that we can't if the material is pointed, we're pointed to it and it's obvious. I'll have to go back and look at that. But do you have any response on the merits of that argument, whether those facts create an issue of fact? Yes. In Bark, America, the party resisting naked licensing put in similar sort of general and conclusory statements. And those were found insufficient to create a question of material fact. Okay. Thank you. Counsel, you have just a few seconds, but we kept your opposing party up so you can talk for a little while. Thank you. I'll hit the points very quickly. There were specific arguments made actually addressing Mr. Beal's personal monitoring of the individual member groups. I can cite specifically to extra record of 652. And it is within the underlying record itself, but we dispute that it wasn't argued. In fact, it was specifically argued throughout our motion, including this concept of there was no loss of significance. It was throughout our motion where we said naked licensing is not a per se rule where you automatically find abandonment. You have to find some deception. There has to be some evidence that consumers were deceived or there was some inconsistent experience among consumers which simply didn't exist. And there are material issues of fact surrounding this particular issue, including what is the right amount of quality controls for an institution like the Free Cycle Network, which is going to be very much unlike the wine industry in the Bark, America case. And Bark, America was very clear to say naked licensing may lead to abandonment, but the key touchstone that you've got to find is whether or not there was actually any evidence of deception. Well, what case do you have where the bar is set as low as you're asking us to set it for you? Well, Starkist is one particular case where there was canned goods that were sold back and forth. This is a Ninth Circuit decision. And what they determined that there was no ñ while there was some naked licensing, there was no evidence that there was an abandonment or deception that consumers would know that they were dealing with a specific entity. And they said, therefore, there is not going to be any naked licensing to be found. McCarthy also echoes that, and we've cited that throughout our briefs. Thank you, counsel. Thank you very much. The case just argued is submitted. We appreciate your helpful arguments.
judges: Graber, Callahan, Bea